[No. B232686. Second Dist., Div. One. Oct. 10, 2012.]

SANDS & ASSOCIATES, Plaintiff and Respondent, v.
MARTIN JUKNAVORIAN, Defendant and Appellant.

1270

COUNSEL

Law Office of Victor Jacobovitz and Victor Jacobovitz for Defendant and Appellant.

Heleni E. Suydam for Plaintiff and Respondent.

OPINION

**MALLANO, P. J.**—The question on appeal is whether a law firm can recover attorney fees under a "prevailing party" clause when the firm is a successful litigant represented by "of counsel." Our analysis is based on two well-settled principles. First, when a law firm is the prevailing party in a lawsuit and is represented by one of its partners, members, or associates, it cannot recover attorney fees even though the litigation is based on a contract with a prevailing party clause. (See *Carpenter & Zuckerman, LLP v. Cohen* (2011) 195 Cal.App.4th 373, 375, 385 [124 Cal.Rptr.3d 598] (*Carpenter*); see also *Trope v. Katz* (1995) 11 Cal.4th 274, 277, 292 [45 Cal.Rptr.2d 241, 902 P.2d 259] (*Trope*).)

Second, the relationship between a law firm and "of counsel" is " 'close, personal, continuous, and regular.' " (*People ex rel. Dept. of Corporations v. SpeeDee Oil Change Systems, Inc.* (1999) 20 Cal.4th 1135, 1153 [86 Cal.Rptr.2d 816, 980 P.2d 371] (*SpeeDee Oil*), italics omitted.) " '[T]o the extent the relationship between [an attorney] or law firm and another

[attorney] or law firm is sufficiently "close, personal, regular and continuous," such that one is held out to the public as "of counsel" for the other, the . . . relationship must be considered a *single, de facto firm* for purposes of [avoiding the representation of adverse interests].' " (*Id.* at p. 1154, italics added, citing State Bar Rules Prof. Conduct, rule 3-310.)

Similarly, because the relationship between a law firm and "of counsel" is close, personal, regular, and continuous, we conclude that a law firm and "of counsel" constitute a single, de facto firm, and thus a law firm cannot recover attorney fees under a prevailing party clause when, as a successful litigant, it is represented by "of counsel."

# I

# BACKGROUND

In 1990, Attorneys Leonard Sands and Heleni Suydam began working together in the area of civil litigation. In March 1999, the law firm of Sands & Associates (Sands firm or firm) was established by Attorney Ada Sands, who, for many years, had been practicing in the areas of family law and estate and probate law. When the Sands firm was founded, Leonard Sands and Heleni Suydam became affiliated with the firm as "of counsel." In that capacity, they "represent[ed] the firm in its collection and appeal matters and the firm's clients when they required civil litigation expertise." (We refer collectively to Leonard Sands and Heleni Suydam as Of Counsel.)

In 2002, Martin Juknavorian retained the Sands firm in a marital dispute. The retainer agreement, dated August 8, 2002, recited that any dispute concerning billing, the agreement, or the representation of Juknavorian would be submitted to binding arbitration. The agreement informed Juknavorian of his right under the Mandatory Fee Arbitration Act (MFAA) (Bus. & Prof. Code, §§ 6200–6206) to require that an attorney fee dispute be arbitrated in accordance with a program established by a local bar association. The agreement also provided: "The arbitrator(s) shall have the discretion to order that . . . reasonable attorney's fees[] shall be borne by the losing party."

A dispute arose between the Sands firm and Juknavorian over attorney fees. Juknavorian invoked his right to arbitration under the MFAA. The Sands firm requested that Of Counsel handle the matter, and they agreed. The parties did not stipulate to a binding award. The arbitration was conducted under the auspices of the Beverly Hills Bar Association. A panel of three

arbitrators rendered an award in favor of the firm in the amount of $24,250.95. The award was served by mail on Juknavorian on May 29, 2007.

On June 27, 2007, Juknavorian filed a legal malpractice action against the firm (*Juknavorian v. Sands & Associates* (Super. Ct. L.A. County, 2009, No. SC094392)). The firm filed a demurrer, contending the action was barred by the statute of limitations. The superior court concluded the action was time-barred and dismissed it. On appeal, Division Seven of this district affirmed (*Juknavorian v. Sands & Associates* (Apr. 22, 2009, B207759) [nonpub. opn.]).

Meanwhile, on March 5, 2008, the firm, through Of Counsel, filed a petition in this case to confirm the arbitration award. On May 21, 2009, the firm filed a memorandum of points and authorities, arguing (1) the arbitration award was binding under the MFAA because Juknavorian had not sought a trial de novo in the superior court within 30 days after service of the award, and (2) the trial court should confirm the award under the California Arbitration Act (CAA) (Code Civ. Proc., §§ 1280–1294.2) because Juknavorian had not filed a timely petition to vacate or correct the award.

Juknavorian opposed the petition, contending the MFAA did not require that he file a complaint seeking a trial de novo within 30 days after service of the arbitration award or, for that matter, at any time. According to Juknavorian, under the MFAA, the arbitration award never became binding and was unenforceable. On June 4, 2009, the trial court, Judge Elizabeth A. Grimes presiding, granted the petition and entered judgment in favor of the firm. Juknavorian appealed. Of Counsel represented the Sands firm on appeal.

In an unpublished opinion, we affirmed the trial court, explaining: "Juknavorian contends that, in accordance with the MFAA, the arbitration award did not become binding and was therefore not subject to confirmation under the CAA. The firm counters that, under the MFAA, the arbitration award became binding when Juknavorian failed, within 30 days after service of the award, to commence a civil action seeking a trial de novo [of the attorney fee dispute]. Further, after the award became binding, it was subject to confirmation, vacatur, or correction under the CAA. The firm contends it filed a timely petition to confirm the award under the CAA; Juknavorian did not file a petition or response to vacate or correct the award, timely or otherwise. . . . [¶] . . . [¶]

". . . [P]rior to the arbitration, the parties did not stipulate that the award would be binding. The arbitrators acknowledged this, stating: 'The award is

advisory *but* will become binding unless the attorney or client rejects it in accordance with the provisions of . . . [the MFAA].' [Business and Professions Code] [s]ection 6203 of the [MFAA] provides: 'Even if the parties to the arbitration have not agreed in writing to be bound, the arbitration award shall become binding upon the passage of 30 days after service of notice of the award, unless a party has, within the 30 days, sought a trial after arbitration pursuant to Section 6204.' . . .

"[Business and Professions Code] [s]ection 6204, in turn, states: 'The parties may agree in writing to be bound by the award of arbitrators appointed pursuant to this article at any time after the dispute over fees, costs, or both, has arisen. *In the absence of such an agreement*, either party shall be entitled to a trial after arbitration if sought within 30 days . . . . [¶] . . . [¶]

" '. . . If no action is pending, the trial after arbitration shall be initiated by the *commencement of an action* in the court having jurisdiction over the amount of money in controversy within 30 days after service of notice of the award. After the filing of such an action, the action shall proceed in accordance with the provisions of . . . the Code of Civil Procedure, concerning civil actions generally.' . . .

"To commence 'an action,' a party *must* file a complaint. . . . [T]he Judicial Council form, 'Rejection of [Arbitration] Award,' . . . expressly states, 'This Rejection of Award and Request for Trial is being filed with a complaint commencing a new action. (A request for trial must be filed in a pending case *or with a complaint commencing a new action*.)' . . .

"The arbitration award was served on May [29], 2007. Within 30 days thereafter, Juknavorian filed a complaint for legal malpractice only. He did not seek a trial de novo of the attorney fee dispute at issue in the arbitration. . . .

"The MFAA states that a binding arbitration award is subject to confirmation, vacatur, or correction under the CAA. . . . The CAA provides that a petition or response seeking to vacate or correct an award must be brought within 100 days after the award is served. . . . Failure to comply with the 100-day period precludes an attack on the award. . . . In contrast, a petition to *confirm* an arbitration award may be brought within four years after service of the award. . . .

"Juknavorian never filed a petition or response to vacate or correct the award. As a result, the trial court had no choice but to grant the firm's petition to confirm." Accordingly, we affirmed the judgment (*Sands & Associates v. Juknavorian* (July 30, 2010, B218019) [nonpub. opn.]).

On remand, the firm, through Of Counsel, filed a motion for attorney fees pursuant to the prevailing party clause in the retainer agreement.[1] In a supporting declaration, Heleni Suydam stated: "I am an attorney and *of counsel to [the] law firm of Sands and Associates*. . . . [¶] . . . [¶] . . . I was requested by Sands & Associates to represent it in connection with the Petition to Confirm the Arbitration Award proceedings, subsequent appeal and post-appeal proceedings. Leonard Sands was also requested to perform limited services with the foregoing. My normal hourly rate is $350.00 per hour and Leonard Sands's is $400.00 per hour. I spent 72.1 hours on these matters, including the preparation and filing of this motion and Leonard Sands spent 7.5 hours. [¶] . . . Sands & Associates has incurred $28,322.50 in attorney fees and expenses of $1,605.16. This includes all attorneys' fees and costs attributable to Heleni Suydam and Leonard Sands to date, plus $2,975.00 in fees for preparing this motion . . . ." (Italics added, fn. omitted.)

The motion did not provide a breakdown or description of the services provided by Of Counsel, nor were any billing statements or time records submitted. There was no evidence of an agreement or understanding between the Sands firm and Of Counsel as to how Of Counsel would be or were compensated. Although the motion was brought on behalf of the firm, it did not indicate whether the firm or Of Counsel would receive the entire award of attorney fees or whether the award would be apportioned.

In his opposition papers, Juknavorian argued that Of Counsel were actually members of the Sands firm and that because the firm was self-represented in the litigation, it could not recover attorney fees.

The firm filed a reply, and, two months later—after the hearing on the motion had been continued—it filed a "supplemental brief." In support of the supplemental brief, Heleni Suydam filed a declaration stating, "From time to time [Leonard Sands and I] required the assistance of Sands & Associates employees, including attorney associates and support staff, but the fees to be recovered [by the motion for attorney fees] do not include any charges for Sands & Associates employees."

Juknavorian filed a "supplemental opposition," and attached undated excerpts from the Martindale-Hubbell Law Directory indicating Heleni Suydam was employed by the Sands firm "as a junior partner, senior attorney, senior

---

[1] The prevailing party clause states that the *arbitrator* may award attorney fees. Here, the *trial court* awarded fees. The Sands firm contends the clause was intended to encompass any attorney fees related to an arbitrated dispute over unpaid fees. Juknavorian does not challenge the trial court's authority to award fees under the clause.

associate, or a similar position"; the directory indicated Leonard Sands had a "counsel" or "of counsel" relationship with the firm.

The firm filed a reply to Juknavorian's supplemental opposition. Heleni Suydam submitted a declaration stating that the Martindale-Hubbell Law Directory mistakenly described her relationship with the firm. She attached an excerpt from the 2008 Parker Directory of California Attorneys indicating she was "of counsel" to the Sands firm. In her declaration, she stated: "The Sands & Associates letterhead has consistently, since the inception of the firm, listed Leonard Sands and Heleni Suydam as 'of counsel.' " Attached to the declaration were letters dated June 9, 2003, and March 24, 2010, on firm letterhead, showing Leonard Sands and Heleni Suydam as "of Counsel." The letterhead had a single telephone number and a single telefacsimile number for the firm *and* Of Counsel. The telephone number on the firm's letterhead was the same number listed in the Parker Directory of California Attorneys for Suydam.

In total, Heleni Suydam submitted four declarations in support of the motion for attorney fees. Each declaration contained a sentence stating in one way or another that she and Leonard Sands were "of counsel" to the firm.

Heleni Suydam's current listing at Martindale.com indicates she is "of counsel" to the Sands firm. (Martindale.com, Lawyer Profile <http://www.martindale.com/Heleni-E-Suydam/2054933-lawyer.htm> [as of Oct. 10, 2012].) The listing states that Suydam is "Currently Employed At Sands & Associates, A PLC, 9606 Santa Monica Blvd., 3rd Fl., Beverly Hills, CA 90210." (*Ibid.*) Martindale.com does not indicate Leonard Sands's relationship to the firm but does state he is "Currently Employed At Sands & Associates, A PLC, 9606 Santa Monica Blvd., 3rd Fl., Beverly Hills, CA 90210." (Martindale.com, Lawyer Profile <http://www.martindale.com/Leonard-S-Sands/168232-lawyer.htm> [as of Oct. 10, 2012].) Thus, both attorneys have the same address, which is also the address of the Sands firm, as shown on its letterhead.

At Lawyers.com, the firm is listed with the same address: "9606 Santa Monica Blvd., 3rd Fl., Beverly Hills." (Lawyers.com, All Attorneys and Law Firms for Beverly-Hills, California <http://www.lawyers.com/California/Beverly-Hills/Sands-and-Associates-A-PLC-2047683-f.html> [as of Oct. 10, 2012].) The Lawyers.com listing also indicates that the "People at This Firm" include Leonard Sands as "Counsel," and Heleni Suydam as "Of Counsel." (*Ibid.*)

The motion for attorney fees was heard on March 3, 2011. The trial court, Judge Cesar C. Sarmiento presiding, issued a written tentative ruling granting the motion. After argument, the trial court took the matter under submission. Later that day, the trial court adopted the tentative ruling as the order of the court. The order stated that the Sands firm was not self-represented even though it litigated the case through "Of Counsel." According to the order, Heleni Suydam did "not represent[] her own interests [in the litigation], but merely those of her employer . . . ."

On April 14, 2011, the trial court entered judgment in favor of the firm, awarding attorney fees in the amount of $25,235. Juknavorian appealed.

## II

## DISCUSSION

"The issue of a party's entitlement to attorney's fees is a legal issue which we review de novo." (*Garcia v. Santana* (2009) 174 Cal.App.4th 464, 468 [94 Cal.Rptr.3d 299]; see *Carpenter, supra*, 195 Cal.App.4th at p. 378; *MBNA America Bank, N.A. v. Gorman* (2006) 147 Cal.App.4th Supp. 1, 6 [54 Cal.Rptr.3d 724].)

On appeal, Juknavorian contends the Sands firm and Of Counsel should be deemed a single, de facto firm for purposes of awarding attorney fees and, consequently, the trial court erred in awarding fees under the prevailing party clause in the retainer agreement. The Sands firm argues to the contrary. Based on *Trope, supra*, 11 Cal.4th 274, and its progeny as well as *SpeeDee Oil, supra*, 20 Cal.4th 1135, we agree with Juknavorian.

A. *Attorney Fee Award to Prevailing Party*

In *Trope, supra*, 11 Cal.4th 274, the Supreme Court stated at the outset: "In this appeal we consider whether an attorney who chooses to litigate in propria persona rather than retain another attorney to represent him in an action to enforce a contract containing an attorney fee provision can nevertheless recover 'reasonable attorney's fees' under Civil Code section 1717 (hereafter section 1717) as compensation for the time and effort expended and the professional business opportunities lost as a result. We shall conclude that such an attorney litigant cannot recover such fees . . . . Were we to construe the statute otherwise, we would in effect create two separate classes of pro se litigants—those who are attorneys and those who are not—and grant different rights and remedies to each. We find no support for such disparate treatment

either in the language of section 1717, in the legislative policy underlying it, or in fairness and logic." (*Trope*, at p. 277.)[2]

The facts in *Trope* were straightforward. Bernard Katz retained Trope & Trope to represent him in a marital dissolution proceeding. The retainer agreement stated that in an action to recover attorney fees from a client, the court could award attorney fees to the law firm if it prevailed. Trope & Trope sued Katz for unpaid fees. Katz filed a cross-complaint alleging legal malpractice. The jury found for Trope & Trope, awarding $163,000, and also found for Katz on the malpractice claim, awarding him $118,500. Because Trope & Trope had a net recovery, it moved for an award of attorney fees as the prevailing party. The trial court denied the motion on the ground that the law firm had represented itself. The Court of Appeal affirmed.

The Supreme Court began its analysis by stating that a written agreement entitling the prevailing party to attorney fees is "subject to the restrictions and conditions of section 1717." (*Trope, supra*, 11 Cal.4th at p. 279.) That statute reads: "In any action on a contract, where the contract specifically provides that attorney's fees and costs, which are *incurred* to enforce that contract, shall be awarded either to one of the parties or to the prevailing party, then the party who is determined to be the party prevailing on the contract, whether he or she is the party specified in the contract or not, shall be entitled to reasonable attorney's fees in addition to other costs." (Civ. Code, § 1717, subd. (a), italics added.)

The court proceeded to analyze the language of Civil Code section 1717: "First, by its terms section 1717 applies only to contracts specifically providing that attorney fees 'which are *incurred* to enforce that contract' shall be awarded to one of the parties or to the prevailing party. . . . To 'incur' a fee, of course, is to 'become liable' for it . . . , i.e., to become obligated to *pay* it. It follows that an attorney litigating in propria persona cannot be said to 'incur' compensation for his time and his lost business opportunities.

"Second, Black's Law Dictionary defines the word 'fee' generally as 'A recompense for an official or professional service or a charge or emolument or compensation for a particular act or service. A fixed charge or perquisite charged as recompense for labor; reward, compensation, or wage given to a person for performance of services or something done or to be done.' . . . It

---

[2] The parties in *Trope* were Sorrell Trope and Eugene L. Trope. The firm, Trope & Trope, was not a party. In its decision, the Supreme Court treated the individual attorneys and the firm interchangeably. Its references to "Trope & Trope" and "the firm" were most likely a shorthand method of referring to the individuals. (See *Gilbert v. Master Washer & Stamping Co.* (2001) 87 Cal.App.4th 212, 217, fn. 14 [104 Cal.Rptr.2d 461]; *Carpenter, supra*, 195 Cal.App.4th at p. 378.)

goes on to define the phrase 'attorney fees' as a 'Charge to client for services performed (e.g. hourly fee, flat fee, contingency fee).' . . . Similarly, Webster's defines the word 'fee' as 'compensation often in the form of a fixed charge for professional service or for special and requested exercise of talent or of skill.' . . . '[F]ee' denotes 'a payment,' such as the 'remuneration paid or due to a lawyer, a physician, or (in recent use) any professional . . . , a director of a public company, etc. for an occasional service' . . . . Accordingly, the usual and ordinary meaning of the words 'attorney's fees,' both in legal and in general usage, is the consideration that a litigant actually pays or becomes liable to pay in exchange for legal representation. An attorney litigating in propria persona pays no such compensation." (*Trope, supra,* 11 Cal.4th at p. 280, citations omitted.)

Further, "to apply [Trope's] reasoning . . . would be to hold that the time and opportunity that an attorney gives up when he chooses to litigate a case in propria persona are somehow qualitatively more important and worthy of compensation than those of other pro se litigants. There is no support in either the language or legislative history of section 1717 for such disparate treatment of pro se litigants on the basis of their occupations. [¶] In fact, such disparate treatment would conflict with the legislative purpose of section 1717. The statute was designed to establish mutuality of remedy when a contractual provision makes recovery of attorney fees available to only one party, and to prevent the oppressive use of one-sided attorney fee provisions." (*Trope, supra,* 11 Cal.4th at p. 285.)

The court rejected Trope's public policy contentions, explaining: "[The law firm] contends it is appropriate to allow attorney litigants to recover attorney fees under section 1717 but to deny such recovery to nonattorney litigants because the latter do not have the same skills as attorneys, have no established billing rates, and are not bound by the same ethical rules as attorneys. We see no reason to conclude, however, that attorney litigants should receive compensation for their time and effort in this context merely because they are more skilled than nonattorneys; indeed, one could quite logically maintain the opposite, because a nonattorney litigant may often have to spend *more* time and exert *more* effort learning the law and procedure relevant to his case, and may be forced to divert even *more* time from his own pursuits, whatever they may be. Nor is it relevant that an attorney must comply with certain ethical rules that do not bind nonattorneys. And the mere fact that attorneys have established billing rates so that the value of their time can be quantified is of little or no significance: were we to conclude that an attorney litigant can recover attorney fees because the value of his time can be calculated on the basis of a fixed hourly rate, it would be irrational not to conclude that all pro

se litigants whose time can likewise be valued on such a basis—such as [a] doctor [or an] architect . . .—should also receive 'reasonable attorney's fees.' " (*Trope, supra*, 11 Cal.4th at pp. 289–290.)

In addition, the Legislature "may . . . prefer to discourage attorneys from electing to appear in propria persona because such self-representation may often conflict with the general public and legislative policy favoring the effective and successful prosecution of meritorious claims. . . . 'Even a skilled lawyer who represents himself is at a disadvantage in contested litigation. Ethical considerations may make it inappropriate for him to appear as a witness. He is deprived of the judgment of an independent third party in framing the theory of the case, evaluating alternative methods of presenting the evidence, cross-examining hostile witnesses, formulating legal arguments, and in making sure that reason, rather than emotion, dictates the proper tactical response to unforeseen developments in the courtroom. The adage that "a lawyer who represents himself has a fool for a client" is the product of years of experience by seasoned litigators.' " (*Trope, supra*, 11 Cal.4th at p. 292.)

In *Trope*, the court concluded "an attorney who chooses to litigate in propria persona and therefore does not pay or become liable to pay consideration in exchange for legal representation cannot recover 'reasonable attorney's fees' under section 1717 as compensation for the time and effort he expends on his own behalf or for the professional business opportunities he forgoes as a result of his decision." (*Trope, supra*, 11 Cal.4th at p. 292.)

In *PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084 [95 Cal.Rptr.2d 198, 997 P.2d 511] (*PLCM Group*), the high court distinguished *Trope* and held that a corporation represented by in-house counsel could recover attorney fees under Civil Code section 1717. In *PLCM Group*, an attorney, David Drexler, was insured for professional malpractice under a policy administered by PLCM Group, Inc. (PLCM). A client sued Drexler for malpractice. The insurer provided a defense. The case settled. Drexler paid only part of the policy's $20,000 deductible. PLCM, through in-house counsel employed by its parent company, filed suit against Drexler for the unpaid portion of the deductible. The jury returned a verdict for PLCM. Pursuant to an attorney fee provision in the policy, PLCM moved for $61,050 in fees. The trial court granted the motion, and the Court of Appeal affirmed.

The Supreme Court agreed, saying: "In *Trope v. Katz, supra*, 11 Cal.4th [274], we considered whether an attorney who chooses to litigate in propria persona rather than retain an attorney to represent him in an action to enforce a contract containing an attorney fee provision can recover attorney fees under Civil Code section 1717. We answered the question in the negative. We

explained that, by definition, the term 'attorney fees' implies the existence of an attorney-client relationship, i.e., a party receiving professional services from a lawyer. . . .

"Nor can an attorney acting in propria persona receive compensation from his opponent 'simply because the time he devotes to litigating a matter on his own behalf has value.' . . . Such an award would constitute disparate treatment, inimical to a statute designed to establish mutuality of remedy: 'If an attorney who is the prevailing party in an action to enforce a contract with an attorney fee provision can recover compensation for the time he expends litigating his case in propria persona, but a nonattorney pro se litigant cannot do so regardless of the personal and economic value of such time simply because he has chosen to pursue a different occupation, *every* such contract would be oppressive and one-sided.' . . . We pointed out that the ordinary meaning of the phrase 'attorney's fees' is the consideration that a litigant actually pays or becomes liable to pay for legal representation, and observed that an attorney litigating in propria persona pays no such compensation. . . . We concluded that an attorney acting in propria persona should not be entitled to lost opportunity costs, as the equivalent of such incurred liability. . . .

"We rejected the argument that the Legislature wished to facilitate or encourage self-representation by attorney litigants[, saying:] . . . ' "Even a skilled lawyer who represents himself is at a disadvantage in contested litigation. . . . He is deprived of the judgment of an independent third party . . . ." ' '

"None of the foregoing considerations apply in the case of in-house counsel. There is no problem of disparate treatment; in-house attorneys, like private counsel but unlike pro se litigants, do not represent *their own personal interests* and are not seeking remuneration simply for lost opportunity costs that could not be recouped by a nonlawyer. A corporation represented by in-house counsel is in an agency relationship, i.e., it has hired an attorney to provide professional legal services on its behalf. Nor is there any impediment to the effective and successful prosecution of meritorious claims because of possible ethical conflict or emotional investment in the outcome. The fact that in-house counsel is employed by the corporation does not alter the fact of representation by an independent third party. Instead, the payment of a salary to in-house attorneys is analogous to hiring a private firm on a retainer." (*PLCM Group, supra,* 22 Cal.4th at pp. 1092–1093, citations omitted, some italics added; see *Lolley v. Campbell* (2002) 28 Cal.4th 367, 374–377 [121 Cal.Rptr.2d 571, 48 P.3d 1128] [under statutory fee-shifting provision (Lab. Code, §§ 98.2, subd. (c), 98.4), indigent employee who prevails against employer on wage claim is entitled to attorney fees when represented by Labor Commissioner].)

The Courts of Appeal have applied *Trope* and *PLCM Group* in several different factual scenarios. In *Gilbert v. Master Washer & Stamping Co., supra,* 87 Cal.App.4th 212, a tenant filed suit against its landlord, alleging breach of contract, and also sued the landlord's attorney, David Gernsbacher, in his individual capacity, alleging he had wrongfully prevented the tenant from recovering its property from the leased premises. Gernsbacher was represented by attorneys from his law firm. He prevailed on one cause of action by demurrer and by summary judgment on the rest. In concluding that Gernsbacher was entitled to an award of attorney fees, the Court of Appeal stated: "There can be no question an attorney-client relationship is . . . present where an attorney litigant is represented by other attorneys in his or her own firm. In this case, [the attorneys of record from Gernsbacher's firm], like the in-house counsel in *PLCM Group* but unlike [the individual attorneys] in *Trope,* represented not their *personal interests or even those of their law firm,* but the *separate and distinct interests* of Gernsbacher himself." (*Gilbert,* at p. 222, italics added.) "[A] member of a law firm who is represented [on a matter of personal interest] by other attorneys in the firm 'incurs' fees within the meaning of Civil Code section 1717. Either the represented attorney will experience a reduced draw from the partnership (or a reduced salary from the professional corporation) to account for the amount of time his or her partners or colleagues have specifically devoted to his or her representation, or absorb a share of the reduction in other income the firm experiences because of the time spent on the case." (*Gilbert,* at p. 221; see *Gorman v. Tassajara Development Corp.* (2009) 178 Cal.App.4th 44, 52, 93–97 [100 Cal.Rptr.3d 152] [where attorney represented wife and himself in lawsuit filed against general contractor hired to build their residence, attorney could not recover attorney fees for his work but could recover for legal services provided by paralegal and associate from his law firm].)

In *Witte v. Kaufman* (2006) 141 Cal.App.4th 1201 [46 Cal.Rptr.3d 845] (*Witte*), the client, Marven Stroh, was initially represented by Knox, Lemmon & Anapolsky (KLA) in an action to dissolve a partnership. KLA later withdrew as counsel of record based on Stroh's nonpayment of fees and filed suit to recover the amount owed. Stroh retained Thomas Witte to provide a defense. Stroh wanted to settle the dispute with KLA and so informed the law firm through an intermediary. KLA responded to Stroh through the intermediary, saying it could not deal directly with him because he was represented by Witte. Stroh discharged Witte, who then filed suit against KLA for interference with contract. KLA, through its own attorneys, filed a special motion to strike, contending Witte's suit was a strategic lawsuit against public participation (SLAPP) (Code Civ. Proc., § 425.16). The trial court granted the motion and awarded KLA attorney fees pursuant to the anti-SLAPP statute (*id.,* subd. (c)(1)).

■ The Court of Appeal reversed the award of attorney fees, stating: "KLA contends it is . . . entitled to attorney fees because it is not appearing in this action in propria persona. Rather, according to KLA, it is being represented by three of [its] attorneys. We are not persuaded. The only way KLA could possibly appear in this action is through one or more of its attorneys, or through outside counsel. By KLA's theory, it could never represent itself in litigation. In *Trope*, the party that was denied attorney fees under Civil Code section 1717 was a law firm that appeared through one of its attorneys. [¶] . . . [¶] Here, unlike *PLCM Group* and *Gilbert*, but like *Trope*, there is no attorney-client relationship between KLA and its individual attorneys. The individual KLA attorneys are not comparable to in-house counsel for a corporation, hired solely for the purpose of representing the corporation. The attorneys of KLA are the law firm's product. When they represent the law firm, *they are representing their own interests*. As such, they are comparable to a sole practitioner representing himself or herself. Where, as in *Gilbert*, an attorney is sued in his or her individual capacity and he obtains representation from other members of his or her law firm, those other members *have no personal stake [or interest] in the matter and may, in fact, charge for their work*. Not so with a law firm that is sued in its own right and appears through various members. [¶] . . . KLA incurred no attorney fees in bringing its motion to strike, because all the work was done by members of the firm on their own behalf. Thus, KLA is not entitled to attorney fees." (*Witte, supra*, 141 Cal.App.4th at pp. 1210–1211, italics added.)

In *Carpenter, supra*, 195 Cal.App.4th 373, the Court of Appeal addressed the same issue raised in *Witte*, explaining: "[I]f the law firm and its partners or associates who acted on behalf of the firm are named and they are all represented by a partner or associate of the law firm, the principles of *Trope* and *Witte* should apply, unless it can be shown that the representation of partners or associates related to the protection of their individual interests from realistic personal exposure. Anytime a law firm sues, its partners will individually benefit from any recovery. Anytime a law firm is sued, any recovery against it will detrimentally affect any partner. And when a law firm is sued in tort for the act of one or more of its lawyers, those lawyers are exposed to liability. In order to recover attorney fees for work done on behalf of individual attorneys in a law firm, there must be a showing that the fees sought to be recovered are not attributable to representation of the law firm." (*Carpenter*, at pp. 387–388.)

In *Mix v. Tumanjan Development Corp.* (2002) 102 Cal.App.4th 1318 [126 Cal.Rptr.2d 267], an attorney, Terence Mix, filed an action in propria persona against the landlord of the building in which he rented office space. The complaint alleged the landlord had overcharged Mix. The landlord filed a separate action against Mix, alleging breach of the lease. The actions were consolidated. Under the lease, the prevailing party in an action was entitled to

reasonable attorney fees. Mix retained the law firm of Allen, Matkins, Leck, Gamble & Mallory (Allen Matkins) for assistance—"to analyze legal and factual issues, help with trial strategy, and assist Attorney Mix in all aspects of the litigation, including trial preparation." (*Id.* at p. 1321.) Allen Matkins also assisted Mix during trial, drafting in limine motions, jury instructions, and a special verdict form, and conducting the examination of Mix. The jury found in favor of Mix in both cases, and judgment was entered in his favor. Thereafter, Allen Matkins associated as counsel of record for Mix. Mix filed a motion to recover the attorney fees he owed Allen Matkins for its assistance. The landlord filed a motion for new trial based on juror misconduct. The trial court granted the motion for new trial and did not rule on Mix's motion for attorney fees.

The Court of Appeal reversed the order granting the new trial and remanded the matter to the trial court with directions to reinstate the judgment and to rule on Mix's motion for attorney fees. Mix filed another motion, seeking the attorney fees he had paid Allen Matkins. Mix did not seek attorney fees for his own time. The trial court granted the motion. The Court of Appeal agreed, stating: "An individual who elects to represent himself or herself may also retain counsel to assist in the prosecution or defense of the action. The retained attorney hired to assist a litigant in propria persona has an attorney-client relationship with the litigant and owes the litigant fiduciary and ethical obligations. Such a retained attorney serves the purposes of providing an independent third party's judgment and a means of examination if the litigant is also a witness. 'Legal counsel is just as necessary—perhaps more necessary—for the party who endeavors to represent himself, as it is for the person who has counsel of record. We certainly think it unwise to adopt a policy which would dissuade litigants from retaining attorneys to assist in lawsuits before the attorney appears with respect to filed documents.' . . . If an attorney is in fact retained by the pro se litigant and renders legal services assisting in the lawsuit, the attorney need not be an attorney of record in order for the reasonable fees of the attorney to be awarded to a prevailing party. . . . Moreover, a rule permitting a litigant in propria persona to recover attorney fees for the legal services of assisting attorneys may be applied equally to both attorney and nonattorney pro se litigants. [¶] . . . [¶]

"In this case, Attorney Mix elected to represent himself in the prosecution and defense of the actions on the lease agreement. He is not entitled to nor does he seek compensation for the time he spent litigating the action. However, Attorney Mix retained Allen Matkins to perform legal services in addition to his own services. Attorney Mix incurred and paid compensation to Allen Matkins for legal services rendered in connection with the litigation. The lease agreement provides for an award of reasonable attorney fees

incurred to enforce the lease agreement. The fees of Allen Matkins were incurred to enforce the lease agreement.

"It is true that Allen Matkins was not an attorney of record at all times during the prosecution and defense of the case. However, Allen Matkins actively participated in the proceedings by preparing a reply and arguing a motion for summary judgment, examining Attorney Mix as a witness at the trial, preparing jury instructions and a verdict form, preparing motions in limine, and otherwise assisting in the preparation and presentation of the case. There is no authority or reason to require a formal association on the record in order for attorney fees to be recoverable." (*Mix v. Tumanjan Development Corp., supra,* 102 Cal.App.4th at pp. 1324–1325, citations omitted.)

In *Ramona Unified School Dist. v. Tsiknas* (2005) 135 Cal.App.4th 510 [37 Cal.Rptr.3d 381], a school district sought to build a school and, in approving the project, issued a mitigated negative declaration under the California Environmental Quality Act (CEQA) (Pub. Resources Code, §§ 21000–21189.3; see *id.*, §§ 21064.5, 21080.5). The school district subsequently "proposed a potential alteration to the project." (*Ramona,* at p. 514.) In response, a neighborhood organization filed a writ petition alleging the proposal violated CEQA and required an environmental impact statement. (See Pub. Resources Code, §§ 21061, 21151.) The trial court denied the petition. The school district then filed an action against the organization, two of its members, and its attorney, Julie Hamilton, alleging abuse of process and barratry. The defendants filed a special motion to strike, contending the action was a SLAPP. All of the defendants were represented by "Special Counsel James Moneer (an expert in anti-SLAPP motions)." (*Ramona,* at p. 523.) Attorney Hamilton continued to represent the organization and the other individual defendants by assisting Moneer with the anti-SLAPP motion. The trial court granted the motion to strike the complaint and awarded attorney fees. (See Code Civ. Proc., § 425.16, subd. (c)(1).)

On appeal, the school district challenged the award of fees. The Court of Appeal affirmed the award, saying: "[The school district] argues the attorney fees award, insofar as the award encompassed fees for the time spent by attorney Hamilton in litigating the anti-SLAPP motion, was erroneous because *Trope*[, *supra*,] 11 Cal.4th 274 . . . holds an attorney who represents him- or herself in propria persona is not entitled to be compensated for the time spent to litigate the lawsuit. [¶] . . . [¶] . . . Here, the evidence supports the determination that Moneer was representing all defendants in connection with the anti-SLAPP motion, and Hamilton rendered legal services to Moneer's nonattorney clients . . . by assisting Moneer's successful defense against [the school district's] suit. Because an attorney-client relationship

existed between the prevailing defendants and Hamilton, *Trope* does not preclude the award of attorney fees merely because Hamilton was a co-defendant with the nonattorney clients to whom she provided legal assistance." (*Ramona Unified School Dist. v. Tsiknas, supra*, 135 Cal.App.4th at pp. 523–525, fn. omitted.)

Finally, we note that the Supreme Court has reaffirmed the principles set forth in *Trope*. In *Musaelian v. Adams* (2009) 45 Cal.4th 512 [87 Cal.Rptr.3d 475, 198 P.3d 560], the court held that a self-represented attorney could not recover monetary sanctions under Code of Civil Procedure section 128.7, which "authorizes trial courts to impose sanctions to check abuses in the filing of pleadings, petitions, written notices of motions or similar papers." (*Musaelian*, at p. 514.) Under that statute, "[s]anctions may include payment to the movant of *attorney fees* [and other *expenses*] *incurred* as a consequence of the violation." (*Ibid.*, italics added.)

Nevertheless, the court explained: "As [Code of Civil Procedure] section 128.7 was adopted before our decision in *Trope*, that decision could have had no influence on the Legislature's intent when it drafted and enacted section 128.7. . . . [T]he usual and ordinary meaning of the words did not change between 1968, when Civil Code section 1717 was enacted, and 1994, when section 128.7 was added to the Code of Civil Procedure. We find, therefore, that the inclusion of the words 'incur' and 'attorney's fees' in section 128.7 implies an agency relationship under which the client and the party are not one and the same, and out of which the attorney expects remuneration. Section 128.7 also identifies attorney fees as an expense, authorizing a court to impose sanctions in the form of 'reasonable attorney's fees and *other expenses* incurred.' . . . The word 'expense' is associated with an obligation to pay: 'something that is expended in order to secure a benefit or bring about a result.' . . . A party who acts on his or her own behalf does not thereby generate an expense that the party has become obligated to pay. And although such a party may lose earnings he or she might have obtained but for devoting time to the litigation, the loss of time from other employment is a loss, not an expense." (*Musaelian v. Adams, supra*, 45 Cal.4th at p. 517, citation & fn. omitted.)

The court continued: "The purpose of [Code of Civil Procedure] section 128.7—deterring filing abuses—will not suffer if attorney fees are not allowed to attorneys representing themselves. Section 128.7 provides the trial court with a wide range of options all of which are designed to deter filing abuses. These options include ordering penalties payable to the court. It follows that a party who engages in abusive filing practices will not avoid monetary sanctions simply because the opposing party is a self-represented attorney. The court also is entitled to act on its own motion, eliminating the

possibility a transgressing party might escape sanctions should the injured party fail to file a motion because he or she will not recover attorney fees. . . . Nor does disallowing attorney fees to attorneys litigating in pro se create a separate and artificial category of litigant who will be inadequately protected against another party's filing abuses. Attorneys are not required to represent themselves but, like other litigants, can choose to engage attorneys to respond to bad faith tactics. [¶] . . . [¶]

"Adams[, the pro se attorney,] suggests the problem of disparate treatment between self-represented attorneys and other self-represented parties could be obviated by construing section 128.7 to require or allow the court to compensate any self-represented litigant for the time and effort spent responding to filing abuses as an 'expense.' But as we have said, the phrase 'expenses incurred' contemplates an obligation that a party has become liable to pay. Section 128.7 does not provide for compensation for time lost from other employment." (*Musaelian v. Adams, supra,* 45 Cal.4th at pp. 519–520, citation omitted.)

B. *General Definition of "Of Counsel"*

In *SpeeDee Oil, supra,* 20 Cal.4th 1135, the Supreme Court explained the background of the case as follows: "This case began when the Attorney General sued SpeeDee Oil and others on behalf of the Department of Corporations, alleging violations of the Franchise Investment Law . . . . Numerous SpeeDee Oil franchisees intervened in the action, including [respondent franchisees]. The franchisees brought [Mobil Oil Corporation (Mobil)] into the action as a defendant in intervention.

"Attorney Geordan Goebel, a sole practitioner, had represented [the franchisees] since 1994. . . . [H]e decided to associate a law firm as attorneys of record to help him prosecute [the franchisees'] claims. Goebel approached the [law firm of Shapiro, Rosenfeld & Close (the Shapiro firm)] because of its expertise in franchise law and met with Mitchell Shapiro on June 22, 1996. Around this time, the Shapiro firm's letterhead listed 14 attorneys' names, with 4 more attorneys listed as of counsel to the firm, all at the same office address. Among those identified as of counsel to the firm was Eliot G. Disner . . . .

"Over the next few weeks, Goebel developed a 'good working relationship' with the Shapiro firm. On July 10, he signed a notice associating the Shapiro firm as counsel of record for [the franchisees]. Mitchell Shapiro signed the notice for the Shapiro firm on July 12. The notice of association of counsel was served by mail on July 15, 1996, and filed with the court the following day.

"The law firm of Cohon and Gardner represented Mobil in the SpeeDee Oil action. Early in July 1996, Jeffrey Cohon, an associate with Cohon and Gardner, spoke to Attorney Steven Hecht about contacting Disner concerning the case. . . . Hecht spoke with Disner later that week. Hecht asked Disner if he knew of the case involving SpeeDee Oil and Mobil. When Disner said he did not, Hecht asked him to call Jeffrey Cohon.

"Disner and Cohon spoke by telephone on July 11 or 12. When Cohon returned Disner's call, the receptionist answered the telephone, 'Shapiro, Rosenfeld and Close.' Cohon's call was put through to Disner, who confirmed he had spoken with Hecht and had not heard of the SpeeDee Oil case or the attorneys involved in it. In a conversation Cohon believed was confidential, he and Disner discussed the case's substantive allegations, its procedural status, and Mobil's theories. They arranged a meeting for July 16.

"On July 16, 1996, Cohon and Gardner Attorneys Bennett Cohon, Jeffrey Cohon, and Steven Gardner met with Disner to discuss his assisting with Mobil's representation. They spoke for one to two hours over lunch. Gardner received a copy of Disner's resume, which—like Disner's business card— prominently featured the Shapiro firm's name and address.

"Gardner briefed Disner on the case and Mobil's position. The matters disclosed to Disner included 'the background of the case, Mobil's theories in the case, Mobil's discovery strategy and an analysis of the procedural and substantive issues which had arisen to date and [were] likely to arise in the future, the state of the case, experts, and consultants, and specific factual issues.' The Cohon and Gardner attorneys considered the information disclosed to Disner to be confidential and attorney work product.

"According to Gardner's and Jeffrey Cohon's declarations, when the meeting ended, Gardner and Disner agreed to prepare a document formally retaining Disner as a consultant. . . . [¶] . . . [¶]

"The next day, July 17, Gardner received the notice of the Shapiro firm's association as counsel for [the franchisees]. Consequently, that same day the Cohon and Gardner firm informed Disner that Mobil would not be using his services. Gardner immediately faxed a letter to the Shapiro firm, Disner, and Goebel, stating that Mobil objected to the Shapiro firm's participation in the case on behalf of [the franchisees]. Gardner's letter asserted the Shapiro firm had an ethical conflict because of Cohon and Gardner's conversations with and disclosures to Disner concerning the case. The Shapiro firm responded with a letter faxed the next day, contending there was no basis for the firm's disqualification. The response stated that the Shapiro firm had already associated as counsel for [the franchisees] when Disner met with the Cohon

and Gardner attorneys. The response also stated that Disner was of counsel to the Shapiro firm and not an associate, partner, or shareholder.

"Four days later, on July 22, 1996, Mobil filed an ex parte application for an order shortening time for a motion to disqualify the Shapiro firm. . . .

"The Shapiro firm's declarations submitted in opposition to Mobil's motion provided additional details of the firm's relationship with Disner. Disner's declaration stated: 'Although I am designated as "Of Counsel" to SRC [(the Shapiro firm)], I have a separate law practice from SRC. I have my own clients, whom I bill separately from SRC. I pay rent to SRC for office space. I have my own staff whom I pay for their services. I do not share in any profits of SRC, nor do I incur any liabilities on behalf of SRC. In those few cases (perhaps 3–4 per year) on which I associate with SRC, which is strictly determined on a case-by-case basis, if I use any attorney from SRC to perform services, I pay SRC a percentage of that attorney['s] usual hourly rate for the time spent working on my clients' cases. Similarly, if SRC uses my services on any cases, it pays me a percentage of my usual hourly fee for services rendered.'

"The trial court denied Mobil's motion to disqualify the Shapiro firm. . . . [¶] The Court of Appeal affirmed the trial court's order . . . . [It] viewed the matter as one involving conflicting evidence and inferences on the actual nature of the particular 'of counsel' relationship in question: 'We agree that *if* [the Shapiro firm] simultaneously represented both Mobil and the [franchisees] in this litigation, it would be subject to automatic disqualification. And we assume for purposes of discussion that by performing legal research for Mobil, Mr. Disner represented it. However, the trial court impliedly concluded Mr. Disner practiced law separate and apart from [the Shapiro firm] except on those few annual occasions when Mr. Disner or [the Shapiro firm] associated the other on a particular case. . . . [There] was *probative and persuasive evidence of a* "close, personal, continuous, and regular" professional affinity which characterizes the "of counsel" relationship. . . . However, *there was conflicting evidence which indicated there was in reality no* "close, personal, continuous, and regular" relationship . . . . Simply stated, the evidence concerning the relationship was in conflict and the trial judge resolved that dispute in favor of one side. . . ." (*SpeeDee Oil, supra*, 20 Cal.4th at pp. 1140–1143, citation & fn. omitted, italics added.)

In reversing the Court of Appeal, the Supreme Court first discussed the principles underlying the disqualification of a law firm or attorney. The court stated: "Protecting the confidentiality of communications between attorney and client is fundamental to our legal system. . . .

"To protect the confidentiality of the attorney-client relationship, the State Bar Rules of Professional Conduct, rule 3-310 (rule 3-310) prohibits attorneys from accepting, without the client's informed written consent, 'employment adverse to the client or former client where, by reason of the representation of the client or former client, the [attorney] has obtained confidential information material to the employment.' . . .

"A related but distinct fundamental value of our legal system is the attorney's obligation of loyalty. Attorneys have a duty to maintain undivided loyalty to their clients to avoid undermining public confidence in the legal profession and the judicial process. . . .

"The most egregious conflict of interest is representation of clients whose interests are directly adverse in the same litigation. . . . Such patently improper dual representation suggests to the clients—and to the public at large—that the attorney is completely indifferent to the duty of loyalty and the duty to preserve confidences. However, the attorney's actual intention and motives are immaterial, and the rule of automatic disqualification applies." (*SpeeDee Oil, supra*, 20 Cal.4th at pp. 1146–1147, citations omitted.)

The court then turned to the facts: "[T]he initial discussions between Disner and the Cohon and Gardner attorneys involved substantial amounts of material confidential information. Moreover, Disner did not receive the information about Mobil's case theories, strategy, and analyses from a layperson who might or might not be knowledgeable about which matters were significant. Instead, after receiving the background information on the case, Disner participated in an extended briefing with the attorneys conducting Mobil's defense against [the franchisees'] claims. Obviously, communications of that kind are likely to involve an efficient transfer of material confidential information and attorney work product." (*SpeeDee Oil, supra*, 20 Cal.4th at p. 1149.)

Next, the court focused on the meaning of "of counsel": " 'The "of counsel" designation has, over the years, come to mean a variety of things in jurisdictions across the nation.' Attorneys who are of counsel to a firm may be permanent full-time practitioners who for various reasons are not on the traditional career path towards partnership in the firm. Of counsel attorneys also may be part-time affiliates of a firm who have other personal or professional commitments, or they may be potential partners brought into a firm for a probationary period. . . .

 "The minimum requirements for designating an attorney in California as being of counsel to a firm are found among the standards for *communications* that presumptively *violate the prohibition against false or deceptive*

*communications*: '. . . A "communication" which states or implies that a member or law firm is "of counsel" to another lawyer or a law firm *unless* the former has a relationship with the latter (other than as a partner or associate, or officer or shareholder . . .) which is *close, personal, continuous, and regular.*' " (*SpeeDee Oil, supra,* 20 Cal.4th at pp. 1152–1153, quoting State Bar Rules Prof. Conduct, rule 1-400(E), std. (8), some italics added.) In other words, if a law firm "communicates" that one or more of its attorneys are "of counsel," and the relationship between the law firm and those attorneys is *not* close, personal, continuous, and regular, the firm has violated the Rules of Professional Conduct by making a false or deceptive communication.

The court in *SpeeDee Oil* continued: "We agree with the State Bar's view that the essence of the relationship between a firm and an attorney of counsel to the firm 'is the closeness of the *"counsel"* they share on client matters. Members of the public are encouraged to consult with those sharing an "of counsel" relationship with the expectation that the counselling resources of both are fully available to clients . . . .' . . . The same view was reflected in the Bar Association of San Francisco's Formal Opinion No. 1985-1: '[A] firm which lists an attorney as "of counsel" on its letterhead, shingle or listing is making an affirmative representation to its clients that the services of that attorney are available to clients of the firm.'

". . . [T]he need to protect client confidences can cause one attorney's conflict of interest disqualification to be imputed to other attorneys in the same firm. . . . When attorneys presumptively share access to privileged and confidential matters because they practice together in a firm, the disqualification of one attorney extends vicariously to the entire firm. . . . The vicarious disqualification rule recognizes the everyday reality that attorneys, working together and practicing law in a professional association, share each other's, and their clients', confidential information. The expectation that attorneys associated together will share confidences is reflected in the American Bar Association Model Rules of Professional Conduct, rule 1.6, comment [8]: 'Lawyers in a firm may, in the course of the firm's practice, disclose to each other information relating to a client of the firm, unless the client has instructed that particular information be confined to specified lawyers.'

"The close, personal, continuous, and regular relationship between a law firm and the attorneys affiliated with it as of counsel contains many of the same elements that justify the rule of vicarious disqualification applied to partners, associates, and members. An of counsel attorney, particularly ‧one frequently in the firm's offices or in contact with the firm's attorneys, may be consulted on a variety of matters without being formally identified as cocounsel. This close, fluid, and continuing relationship, with its attendant exchanges of information, advice, and opinions, properly makes the "of counsel"

attorney subject to the conflict imputation rule, regardless of whether that attorney has any financial stake in a particular matter. . . .

"We find persuasive . . . the State Bar of California's conclusion in its 1993 ethics opinion on the subject: '[T]o the extent the relationship between [an attorney] or law firm and another [attorney] or law firm is sufficiently "close, personal, regular and continuous," such that one is held out to the public as "of counsel" for the other, the . . . relationship must be considered a *single, de facto firm* for purposes of rule 3-310. Accordingly, if the "of counsel" is precluded from a representation by reason of rule 3-310 of the California Rules of Professional Conduct, the principal is presumptively precluded as well, and vice-versa.' . . . The American Bar Association Committee on Ethics and Professional Responsibility reached the same conclusion in its Formal Opinion No. 90-357: 'There can be no doubt that an of counsel lawyer (or firm) is "associated in" and has an "association with" the firm (or firms) to which the lawyer is of counsel, for purposes of both the general imputation of disqualification . . . and the imputation of disqualification resulting from former government service . . . . Similarly, the of counsel lawyer is "affiliated" with the firm and its individual lawyers for purposes of the general attribution of disqualifications under DR 5-105(d) of the Model Code [of Professional Responsibility].[3] . . .' . . . Notwithstanding the variations to be expected across the nation on any point of law, the prevailing view is that for purposes of disqualification, the of counsel attorney is considered to be affiliated with a firm so that the disqualification of one from representation must be imputed to the other. . . .

". . . [R]egardless of the frequency with which Disner and the Shapiro firm formally associated for cases, or the independence of the business aspects of their practices, their basic relationship was 'close, personal, continuous, and regular.' Such a relationship, inherent in designating an attorney as of counsel to a firm, does justify a presumption that client confidences will be disclosed and exchanged in informal consultations. Hence, the conflict of interest of one will be imputed to the other, with the consequence that disqualification must follow.

"In order to designate themselves as of counsel, attorneys must have close, personal, continuous, and regular relationships with their affiliated firms. Consequently, the attorneys brought together in these relationships frequently will have occasion to share client confidences in the course of exchanging advice and performing legal services for those clients. The fundamental

---

[3] American Bar Association Model Code of Professional Responsibility, Disciplinary Rule 5-105(D) states: "If a lawyer is required to decline employment or to withdraw from employment under a Disciplinary Rule, no partner, or associate, or any other lawyer affiliated with him or his firm, may accept or continue such employment."

nature of the relationship makes a presumption of shared confidences as appropriate for the of counsel attorney as it is for partners, associates, and members of law firms. From the clients' and the public's perspective, the of counsel attorney can hardly be distinguished from other attorneys who may be more closely tied to a firm financially. As a result, the need to preserve confidentiality and public confidence in the integrity of the legal profession and judicial process require that of counsel attorneys be regarded as the same as partners, associates, and members of law firms for conflict of interest issues." (*SpeeDee Oil, supra,* 20 Cal.4th at pp. 1153–1155, citations & fn. omitted, 2d italics added.)

Although *SpeeDee Oil* involved the disqualification of a law firm, we see no reason why its definition of "of counsel" would differ in another context, such as the recovery of attorney fees. Indeed, regardless of the context, if an attorney is held out to the public as "of counsel" to a law firm, and the relationship between them is *not* close, personal, continuous, and regular, the "of counsel" designation violates the State Bar's ethical rules. (See Rules Prof. Conduct, rule 1-400(E), std. (8).)

C. *Relationship Between the Sands Firm and Of Counsel*

Typically, when a trial court resolves conflicting evidence presented in declarations, the appellate courts defer to the trial court's resolution of the conflicts: "The resolution of factual issues arising from competing declarations is conclusive on the reviewing court, and conflicts in the declarations are resolved in favor of the prevailing party." (*Rosenfeld Construction Co. v. Superior Court* (1991) 235 Cal.App.3d 566, 572–573 [286 Cal.Rptr. 609], citations omitted; accord, *CenterPoint Energy, Inc. v. Superior Court* (2007) 157 Cal.App.4th 1101, 1117–1118 [69 Cal.Rptr.3d 202]; *In re Marriage of Coffin* (1976) 63 Cal.App.3d 139, 149–150 [133 Cal.Rptr. 583].)

The evidence in *SpeeDee Oil* as to the "closeness" of the "of counsel" relationship between Attorney Disner and the Shapiro firm was conflicting. (See *SpeeDee Oil, supra,* 20 Cal.4th at p. 1143.) Although the Court of Appeal accepted the trial court's resolution of the conflicts (see *ibid.*), the Supreme Court did not (see *id.* at p. 1155), deciding instead to adopt a bright-line rule: Where an attorney is held out to the public as "of counsel" to a law firm, the relationship between the two is " 'close, personal, continuous, and regular.' " (*Id.* at p. 1153, italics omitted; see Sukowicz, "Of Counsel" Liability (County Bar Update, June/July 2003, vol. 23, No. 6) <http://www.lacba.org/showpage.cfm?pageid=3123> [as of Oct. 10, 2012] ["Although the court in *SpeeDee Oil* noted that the 'of counsel' attorney rented space in the firm's offices, talked frequently with its attorneys and discussed legal issues pertaining to cases the firm was handling, it did not rely on those factors for its decision."].)

" 'The interests of clients, counsel, and the courts are best served by maintaining, to the extent possible, bright-line rules . . . .' " (*In re Marriage of Lafkas* (2007) 153 Cal.App.4th 1429, 1434 [64 Cal.Rptr.3d 100]; accord, *Poster v. Southern Cal. Rapid Transit Dist.* (1990) 52 Cal.3d 266, 272 [276 Cal.Rptr. 321, 801 P.2d 1072].) We adopt a bright-line rule in this case. To do otherwise would permit an "of counsel" attorney to create a factual dispute as to whether his or her relationship with a law firm is close, personal, continuous, and regular.

Here, the Sands firm communicated to the public that Leonard Sands and Heleni Suydam were "of counsel" to the firm. Both attorneys were listed as "of Counsel" on the firm's letterhead and appeared in various attorney directories as "counsel" or "of counsel" to the firm. Thus, it does not matter that they may have represented clients obtained through their own efforts, that they had what they call a "separate" practice, or that they were not on the firm's payroll. In *SpeeDee Oil*, Attorney Disner made similar statements in his declaration, but the Supreme Court disregarded them. (See *SpeeDee Oil, supra*, 20 Cal.4th at p. 1142 [in declaration, Disner stated he had a "separate law practice" from Shapiro firm and had his "own clients," "office space" and "staff"]; *id.* at p. 1155 [disregarding Disner's declaration in adopting disqualification rule applicable when attorney is designated "of counsel" to law firm]; Sukowicz, "Of Counsel" Liability, *supra*, vol. 23, No. 6 <http://www.lacba.org/showpage.cfm?pageid=3123> [as of Oct. 10, 2012].)

■ According to the Committee on Professional Ethics of the American Bar Association: "It is the Committee's view that, whatever the connotative differences evoked by these variants of the title 'counsel,' they all share the central, and defining, characteristic of the relationship that is denoted by the term 'of counsel' . . . . That core characteristic properly denoted by the title 'counsel' is . . . a 'close, regular, personal relationship'; but a relationship which is neither that of a partner (or its equivalent, a principal of a professional corporation), with the shared liability and/or managerial responsibility implied by that term; nor, on the other hand, the status ordinarily conveyed by the term 'associate,' which is to say a junior non-partner lawyer, regularly employed by the firm.

■ "This core characteristic of the title 'counsel' is shared by several kinds of relationships that in other respects vary in significant ways. There appear to be *four principal patterns of such relationships*, all of which in the Committee's view are properly referred to by the title 'of counsel' (or one of its variants). Perhaps the commonest of such relationships is that of a part-time practitioner who practices law in association with a firm, but on a basis different from that of the mainstream lawyers in the firm. Such part-time practitioners are sometimes lawyers who have decided to change

from a full-time practice, either with that firm or with another, to a part-time one, or sometimes lawyers who have changed careers entirely, as for example former judges or government officials. A second common use of the term is to designate a retired partner of the firm who, although not actively practicing law, nonetheless remains associated with the firm and available for occasional consultation. A third use of the term is to designate a lawyer who is, in effect, a probationary partner-to-be: usually a lawyer brought into the firm laterally with the expectation of becoming partner after a relatively short period of time. *A fourth, relatively recent, use of the term is to designate a permanent status in between those of partner and associate—akin to the category just described, but having the quality of tenure, or something close to it, and lacking that of an expectation of likely promotion to full partner status.*" (ABA Com. on Prof. Ethics, formal opn. No. 90-357 (1990), p. 3, fn. omitted & italics added.) Here, of the four "principal patterns" described by the American Bar Association, the relationship between the Sands firm and Of Counsel resembles the fourth pattern.

■ Further, "the [American Bar Association] remains of the view . . . that it is not ethically permissible to use the term 'of counsel' to designate the following professional relationships: a relationship involving only an individual case . . . ; a relationship of forwarder or receiver of legal business . . . ; a relationship involving only occasional collaborative efforts among otherwise unrelated lawyers or firms. . . ; and the relationship of an outside consultant . . . ." (ABA Com. on Prof. Ethics, formal opn. No. 90-357, *supra*, p. 4, citations & fn. omitted.) None of those exceptions applies in this case. And although an "of counsel" relationship between an attorney and a law firm is, by definition, "regular," the contact between them need not "be so frequent as to verge on daily." (*Ibid.*)

"The 'of counsel' relationship clearly is something more than an office-sharing arrangement. . . . However, office sharing or use of common employees are commonly attributes of the 'of counsel' relationship." (Bar Assn. of S.F., formal opn. No. 1985-1, citation omitted, available online at <http://www.sfbar.org/ethics/opinion_1985-1.aspx> [as of Oct. 10, 2012].)

In light of the close, personal, continuous, and regular relationship between the Sands firm and Of Counsel (see *SpeeDee Oil, supra,* 20 Cal.4th at pp. 1153–1155), we conclude that, in recovering the unpaid attorney fees from Juknavorian, Of Counsel were pursuing the interests of the Sands firm and their own personal interests; the firm and Of Counsel had the same interests. (See *PLCM Group, supra,* 22 Cal.4th at p. 1093; *Gilbert v. Master Washer & Stamping Co., supra,* 87 Cal.App.4th at p. 222; *Dzwonkowski v. Spinella* (2011) 200 Cal.App.4th 930, 936 [133 Cal.Rptr.3d 274] (*Dzwonkowski*); *Carpenter, supra,* 195 Cal.App.4th at p. 385; *Witte, supra,*

141 Cal.App.4th at p. 1211.) Given the close, personal relationship between the Sands firm and Of Counsel, we cannot say that Of Counsel provided the firm with "the judgment of an independent third party." (*Trope, supra*, 11 Cal.4th at p. 292; see *PLCM Group, supra*, 22 Cal.4th at pp. 1092–1093.)

Similarly, because Of Counsel was attempting to recover attorney fees owed to the Sands firm by a former client, and because the firm and Of Counsel constituted a "single, de facto firm" (*SpeeDee Oil, supra*, 20 Cal.4th at p. 1154), an attorney-client relationship did not exist between them. (See *PLCM Group, supra*, 22 Cal.4th at p. 1092; *Witte, supra*, 141 Cal.App.4th at p. 1210.) Further, no evidence supports the conclusion that the firm "incurred" an obligation to pay $25,235—what the trial court awarded—or any other amount to Of Counsel, whether determined by the hours spent on the case or as a percentage of the recovery. Of Counsel did not offer any evidence indicating how they would be or were compensated by the firm. In moving for attorney fees, Of Counsel did not submit any billing statements or time records—documents that would suggest the Sands firm had "incurred" attorney fees; nor did Of Counsel provide a breakdown or description of their services. (See *City of Colton v. Singletary* (2012) 206 Cal.App.4th 751, 784–785 [142 Cal.Rptr.3d 74]; *Dzwonkowski, supra*, 200 Cal.App.4th at pp. 934, 935.) For all we know, the firm paid Of Counsel in accordance with "a permanent status in between those of partner and associate." (ABA Com. on Prof. Ethics, formal opn. No. 90-357, *supra*, p. 3.) And Of Counsel had offices at the same address as the Sands firm, were assisted by the firm's associates and support staff, and had the same telephone and telefacsimile numbers as the firm. (See *SpeeDee Oil, supra*, 20 Cal.4th at pp. 1153–1154 & fn. 6.)

In granting the motion for attorney fees, the trial court awarded the Sands firm $25,235 in attorney fees for having recovered $24,250.95 in unpaid fees from Juknavorian. If the Sands firm had pursued the unpaid fees by using one of its partners, members, or associates, it would not have been allowed to "double" its recovery; the trial court would have erred in granting the motion for attorney fees. (See *Carpenter, supra*, 195 Cal.App.4th at pp. 375, 385; *Witte, supra*, 141 Cal.App.4th at p. 1211.) Permitting such a recovery when a law firm uses an attorney who has a close, personal, continuous, and regular relationship with it—where the law firm and the attorney constitute a "single, de facto firm" (*SpeeDee Oil, supra*, 20 Cal.4th at p. 1154)—would result in disparate treatment between attorney litigants and nonattorney litigants, contrary to the purpose of Civil Code section 1717. (See *Trope, supra*, 11 Cal.4th at pp. 277, 285.) By using a public designation of "of counsel" for its litigation attorneys, a law firm may recover attorney fees as the prevailing party, but a nonattorney litigant has no such option. Here, the Sands firm

provided legal advice to its clients in a number of substantive areas, but Of Counsel handled the firm's collection and appeal matters and represented the firm's clients in litigation.

█ As stated, in *SpeeDee Oil, supra*, 20 Cal.4th 1135, the Supreme Court adopted a bright-line rule in disqualification matters regarding "of counsel." (See *id.* at pp. 1142, 1155; Sukowicz, "Of Counsel" Liability, *supra*, vol. 23, No. 6 <http://www.lacba.org/showpage.cfm?pageid=3123> [as of Oct. 10, 2012].) We follow the high court's example and adopt a bright-line rule regarding attorney fees: When a law firm holds an attorney out to the public as "of counsel," the firm cannot recover attorney fees under a prevailing party clause when, as a successful litigant, it is represented by "of counsel."

Our conclusion is not inconsistent with *Dzwonkowski, supra*, 200 Cal.App.4th 930. There, a client, Michael Spinella, retained a sole practitioner, Edward Dzwonkowski, to represent him in a probate matter. The retainer agreement expressly excluded litigation services. When the probate matter proceeded to litigation, Dzwonkowski retained another sole practitioner, Russ Boltz, to handle the matter. Later, Spinella disputed what he was charged and declined to pay the amount owed. Dzwonkowski retained Boltz to represent him in a fee dispute arbitration with Spinella. Dzwonkowski prevailed in the arbitration, obtaining an award of $33,306 in fees, and successfully petitioned the trial court to confirm the award. Dzwonkowski then filed a motion for attorney fees based on the services performed by Boltz. In support of the motion, Dzwonkowski attached billing statements from Boltz and submitted evidence showing that, by agreement, Boltz was entitled to 10 percent of any recovery. The trial court granted the motion, awarding Dzwonkowski attorney fees in the amount of $16,344.41 for Boltz's work.

On appeal, as in the trial court, Spinella argued that Dzwonkowski was not entitled to additional attorney fees because Boltz was "of counsel" to Dzwonkowski. The Court of Appeal, as did the trial court, rejected that argument, distinguishing *SpeeDee Oil*: "Spinella relies on [*SpeeDee Oil, supra,*] 20 Cal.4th 1135 . . . to define the 'of counsel' relationship, but the issue in *SpeeDee* was whether to impute a conflict of interest to a law firm when one of its 'of counsel' attorneys received substantial amounts of confidential information from the party litigating against a client represented by the law firm. . . . In *SpeeDee*, the law firm listed 14 attorneys' names on its letterhead, with four more attorneys listed as 'of counsel' to the firm, and all the attorneys were listed at the same address. . . . When a client returned a telephone call from the 'of counsel' attorney involved in the dispute, the receptionist answered the telephone in the name of the law firm. . . . In contrast, both Boltz and Dzwonkowski are sole practitioners; Boltz maintains his own office . . . ." (*Dzwonkowski, supra*, 200 Cal.App.4th at pp. 935–936,

citations omitted.) Dzwonkowski worked in an office located in Huntington Beach with the assistance of a part-time secretary, while Boltz maintained a separate office in Laguna Beach. (*Id.* at p. 933.) And "Boltz [did] not maintain any *regular* presence in Dzwonkowski's office." (*Ibid.*, italics added.) As the Court of Appeal stated, "There is substantial evidence to support (1) Dzwonkowski's obligation to pay Boltz attorney fees, (2) an attorney-client relationship between Boltz and Dzwonkowski, and (3) distinct interests between Boltz and Dzwonkowski." (*Id.* at p. 937.)

We have already concluded in this case that (1) the Sands firm did not incur $25,235 or any other amount of attorney fees to Of Counsel, (2) an attorney-client relationship did not exist between the firm and Of Counsel, and (3) the interests of the Sands firm and Of Counsel were the same. In addition, our conclusion applies only where an attorney is held out to the public as "of counsel"; *Speedee Oil* was limited in the same way. (See *SpeeDee Oil, supra,* 20 Cal.4th at pp. 1153–1154.)

In *Dzwonkowski,* the trial court and the Court of Appeal simply accepted the attorneys' self-description of their professional relationship as "of counsel." There was no evidence that anyone other than the two sole practitioners knew Boltz was "of counsel" to Dzwonkowski; Boltz was not held out to the public as "of counsel" to Dzwonkowski. Nor was there evidence in *Dzwonkowski* of a close, personal, continuous, and regular relationship between the two attorneys other than "[Boltz] provides litigation services for some of Dzwonkowski's clients on a contract basis." (*Dzwonkowski, supra,* 200 Cal.App.4th at p. 933.) Nothing in *Dzwonkowski* indicated that Boltz was listed on Dzwonkowski's letterhead as "of counsel" or in any other capacity. And although *SpeeDee Oil* involved the disqualification of a law firm, its definition of "of counsel" should not vary depending on the situation. The definition in *SpeeDee Oil* was based on the State Bar's ethical rules prohibiting false and deceptive communications—a prohibition that applies without regard to context. (See Rules Prof. Conduct, rule 1-400(E), std. (8).) Simply put, based on the facts in *Dzwonkowski,* we agree with its result and conclude that its discussion of "of counsel" does not mean the Sands firm was entitled to attorney fees for work performed by Of Counsel on the *Juknavorian* matter.

■ In sum, the Sands firm publicly designated Leonard Sands and Heleni Suydam as "of counsel." Those attorneys, on behalf of the firm, recovered unpaid attorney fees owed by a former client. The firm could not recover additional attorney fees under the prevailing party clause in the retainer agreement because it was self-represented.

## III

## DISPOSITION

The judgment is reversed as to the award of attorney fees. Appellant is entitled to costs on appeal.

Rothschild, J., and Chaney, J., concurred.

A petition for a rehearing was denied October 30, 2012, and the opinion was modified to read as printed above. Respondent's petition for review by the Supreme Court was denied January 23, 2013, S207167.